IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | | |
|---|---|---|
| RICK L. CASADA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 04-3467-CV-S-ODS |
| | ) | |
| LESTER E. COX MEDICAL CENTERS, | ) | |
| | ) | |
| Defendant. | ) | |

<u>ORDER AND OPINION GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT</u>

Pending is Defendant's Motion for Summary Judgment. For the following reasons, the motion (Doc. # 31) is granted.

<u>I. BACKGROUND</u>

The record reveals the following uncontroverted facts. Plaintiff had two terms of employment with Defendant. The first term ended when Plaintiff voluntarily quit to pursue other opportunities and is not relevant to these proceedings. The second term commenced in June 1998, at which time he was employed as a Clinical Systems Consultant ("CSC"). A CSC's duties involved going to clinics to perform tasks (including training of employees at the clinics), but Plaintiff testified the job as he performed it required analyzing data, programming, and scheduling visits by other CSC's. As he performed his job, he was required to go to his employer's offices, and a CSC's duties required travel to other offices; thus, regardless of how Plaintiff performed his duties, he was required to drive. Plaintiff's Dep. at 14-16, 42, 64, 67, 118-20.

In October or November 2002, Plaintiff began suffering from headaches on a daily basis. He was diagnosed as suffering from severe pulsatile tinnitus[1] accompanied

---

[1]According to a website maintained by the Mayo Clinic, "[t]innitus is a noise that originates within your ear rather than from an external source. The sound may be described as hissing, squealing, buzzing or roaring. In pulsatile tinnitus, the sound

by continuous headache cycles of varying duration and intensity. Plaintiff's Dep. at 80-81. In light of his condition, Plaintiff's doctor restricted him from driving for more than thirty minutes at a time. This restriction prevented Plaintiff from being able to physically travel, either from home to work or between Defendant's clinics. Moreover, on some days the headaches were of such severity Plaintiff was incapable of performing any work even if he was in a location where work could be performed. Changes in symptoms usually indicated the onset of the most severe headaches within one to two days, but otherwise Plaintiff could not predict the severity of his headaches. Plaintiff's Dep. at 53-54. He initially requested and was granted intermittent leave under the Family and Medical Leave Act ("FMLA"), and later (in July 2003) requested and was granted full-time leave under the FMLA.

One week after being granted full-time leave, Plaintiff complained to Margo Hankey, Defendant's Human Resources Director, that his supervisor (Lorrie McMillen) had harassed him about his FMLA leave and made disparaging racial comments regarding his granddaughter (who is one-quarter African-American). He identifies McMillen's questions about his condition and treatment as harassing; examples of such questions include asking when he would be returning from a doctor's appointment, when his condition was expected to improve, and suggesting that he take full-time FMLA leave instead of intermittent leave. Plaintiff's Dep. at 37, 74, 76-77, 122-23, 145-46. The racially based comments Plaintiff complained about consisted of McMillen referring to those she supervised (sometimes collectively, sometimes individually) as "nigs." Plaintiff's Tr. at 149-51.

Defendant has promulgated policies prohibiting discrimination and harassment. Plaintiff describes these policies as "perfunctory," but does not deny the existence of the policies or his receipt and awareness of them. Following receipt of Plaintiff's complaint, an investigation was conducted and witnesses were interviewed. Again, Plaintiff labels these endeavors as "perfunctory," but does not deny they occurred. The investigation

---

follows the same rhythm as your heartbeat."
http://www.mayoclinic.com/health/pulsatile-tinnitus/AN00669/si=2765

revealed several occasions in which McMillen had utilized inappropriate racial references (though it could not be confirmed they were made in reference to Plaintiff's granddaughter), and she was disciplined and required to attend training. Hankey Affidavit ¶ 8.[2] The investigation failed to unearth any indication Plaintiff had been harassed for exercising his rights under the FMLA. Plaintiff does not contend he was harassed after he complained.

Plaintiff also testified McMillen made gender-based comments, such as "all men think alike." Plaintiff's Dep. at 186-88. However, he did not bring these comments to Hankey's attention. Hankey Affidavit ¶ 4.[3]

Plaintiff exhausted his FMLA leave on August 7, 2003, and commenced taking leave under Defendant's leave policy, which allows employees to take up to eighteen months of medical leave. While on "company leave" (as opposed to FMLA leave), an employee may return to work if medically able to do so and if a position is available. Upon return, an employee returns to their former salary and seniority. Plaintiff exhausted his company leave and never returned to work for Defendant. While on leave, Plaintiff's salary and benefits were never diminished. Plaintiff's Dep. at 129-30.

Meanwhile, on August 13, 2003, Plaintiff filed a charge of discrimination with the EEOC. On September 9, 2003, Plaintiff applied for long term disability benefits from AIG, which provided such coverage to Defendant's employees. On January 21, 2004, Plaintiff applied for disability benefits from the Social Security Administration. In the latter application, Plaintiff reported that he stopped working for Defendant due to the random headaches that prevented him from maintaining a regular work schedule, that his condition commenced on October 1, 2002, and that he became incapable of working on July 5, 2003. Plaintiff's Dep. at 62-63, 87; Plaintiff's Dep. Exhibit P. Plaintiff's

---

[2]Plaintiff asserts he was never told McMillen was disciplined. Plaintiff's Affidavit, ¶ 15. This may be, but it does not dispute the fact that she was disciplined.

[3]Plaintiff does not offer a citation to the record disputing this fact. He contends he was harassed based on his gender, but this does not demonstrate that he communicated this fact to Hankey or any other company official.

3

application for social security benefits was approved, and he continues to receive social security benefits to this day.

## II. DISCUSSION

A moving party is entitled to summary judgment on a claim only if there is a showing that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See generally Williams v. City of St. Louis, 783 F.2d 114, 115 (8th Cir. 1986). "[W]hile the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Get Away Club, Inc. v. Coleman, 969 F.2d 664 (8th Cir. 1992). In applying this standard, the Court must view the evidence in the light most favorable to the non-moving party, giving that party the benefit of all inferences that may be reasonably drawn from the evidence. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588-89 (1986); Tyler v. Harper, 744 F.2d 653, 655 (8th Cir. 1984), cert. denied, 470 U.S. 1057 (1985). However, a party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of the . . . pleadings, but . . . by affidavits or as otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).[4]

---

[4] Plaintiff has submitted an affidavit in an attempt create factual disputes requiring jury resolution. In many instances, his sworn statements do not dispute the facts in question. A few of these instances are referenced herein. In other instances, Plaintiff's affidavit directly contradicts his sworn deposition testimony. These statements cannot be considered because they do not merely resolve ambiguities in Plaintiff's deposition testimony, but rather contradict his deposition testimony without explanation or justification. E.g., RSBI Aerospace, Inc. v. Affiliated FM Ins. Co., 49 F.3d 399, 402 (8th Cir. 1995); Camfield Tires, Inc. v. Michelin Tire Corp., 719 F.2d 1361, 1364-66 (8th Cir.1983). The Court has simply ignored these statements, and has provided citations to Plaintiff's deposition to demonstrate the record support for the propositions in question.

4

A. Americans With Disabilities Act

1. *Discriminatory Discharge*[5]

Plaintiff contends Defendant discriminated against him based on his disability in violation of the Americans with Disabilities Act ("ADA"). The ADA prohibits discrimination "against a qualified individual with a disability because of the disability of such individual . . . . " 42 U.S.C. § 12112(a). A plaintiff must first establish a prima facie case of discrimination by demonstrating (1) he is disabled within the meaning of the ADA; (2) he is qualified to perform the essential functions of his job with or without reasonable accommodation; and (3) he suffered an adverse employment action under circumstances that give rise to an inference of unlawful discrimination based on disability. Heisler v. Metropolitan Council, 339 F.3d 622, 626-27 (8th Cir. 2003). Attendance at work is an essential function of any job, Epps v. City of Pine Lawn, 353 F.3d 588, 595 n.5 (8th Cir. 2003), and Plaintiff concedes he could not work on a regular or even predictable schedule. Plaintiff contends he could have performed his work from home, but offers nothing more than his own opinion on the matter. More importantly, he does not explain how he could perform his job from home in light of his testimony that his duties required him to drive from his home to other places (be it Defendant's business or to clinics) and that he had uncontrollable headaches that frequently prevented him from performing work-related activities even while he was at home. It must also be remembered that Plaintiff opted to take FMLA leave (and then company leave) based upon his doctor's recommendation, and there is no indication his doctor ever suggested he could return to work. Finally, when Plaintiff applied for social

---

[5]It is not clear that Plaintiff was ever discharged; the record suggests he simply never returned to work after his company leave expired. There is also no suggestion that Plaintiff asked to return to work or that he requested any accommodations be made for his disability. For the sake of discussion, the Court will resolve these ambiguities in Plaintiff's favor.

5

security benefits he declared that he was unable on July 5, 2003, and was never able to work thereafter.

> When faced with a plaintiff's previous sworn statement asserting "total disability" or the like, the court should require an explanation of any apparent inconsistency with the necessary elements of an ADA claim. To defeat summary judgment, that explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good-faith belief in, the earlier statement, the plaintiff could nonetheless "perform the essential functions" of her job, with or without "reasonable accommodation."

Cleveland v. Policy Management Systems Corp., 526 U.S. 795, 807 (1999). Plaintiff has not offered an explanation reconciling the statements in his social security application with his present declaration that he could have worked after July 5, 2003.

The record establishes Plaintiff was unable to come to work or otherwise adhere to a regular and predictable schedule. Consequently, Plaintiff is not a qualified person with a disability as defined in the ADA, so Defendant is entitled to judgment as a matter of law on Plaintiff's claim of disability discrimination.

### *2. Harassment*

> In determining whether a hostile work environment claim has been made out under the ADA, we think it proper to turn to standards developed elsewhere in our anti-discrimination law, adapting them to the unique requirements of the ADA. To be entitled to relief, it seems to us that [a plaintiff] must show that he is a member of the class of people protected by the statute, that he was subject to unwelcome harassment, that the harassment resulted from his membership in the protected class, and that the harassment was severe enough to affect the terms, conditions, or privileges of his employment.

Shaver v. Independent Stave Co., 350 F.3d 716, 720 (8th Cir. 2003). The harassing acts "must be both subjectively hostile or abusive to the victim and severe and pervasive enough to create an objectively hostile or abusive work environment--an

6

environment that a reasonable person would find hostile or abusive. On the other hand, we have repeatedly emphasized that anti-discrimination laws do not create a general civility code. Conduct that is merely rude, abrasive, unkind, or insensitive does not come within the scope of the law." Id. at 721 (quotations omitted).

Plaintiff testified that McMillen prepared his schedule. Plaintiff's Dep. at 78-79. Consequently, inquiries about his availability for work (i.e., asking when he would return from leave or when he would return from a doctor's appointment) are not objectively hostile or abusive. Similarly, suggesting that someone on intermittent leave consider taking full-time FMLA leave is not objectively hostile or abusive. Plaintiff characterized these questions as rude and inappropriate, but rudeness alone will not create a cognizable claim of harassment. Construing the record in Plaintiff's favor, the record demonstrates Plaintiff was not subjected to unlawful harassment.

## B. Racially Hostile Work Environment

Plaintiff contends McMillen's reference to those she worked with as "nigs" created a racially hostile work environment. Plaintiff is Caucasian, but his granddaughter is one-quarter African-American. Defendant concedes courts allow associational claims under Title VII. The term "nigs" is, without doubt, inappropriate, but Plaintiff admits McMillen never directed the term directly to him or used it while referring to his granddaughter. Plaintiff's Dep. at 149-51.

> An employer violates Title VII if the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. . . . Whether an environment was objectively hostile or abusive must be judged by looking at the totality of the circumstances, including the frequency and severity of the discriminatory conduct, whether such conduct was physically threatening or humiliating, as opposed to a mere offensive utterance, and whether the conduct unreasonably interfered with the employee's work performance.

7

Eliserio v. United Steelworkers of America Local 310, 398 F.3d 1071, 1076 (8th Cir. 2005). There is no evidence regarding the frequency of McMillen's statements, but they were not communicated directly to, and did not refer directly to, Plaintiff. They were not threatening, and there is no indication they interfered with Plaintiff's work performance. The comments were significantly more benign than those present in Reedy v. Quebecor Printing Eagle, Inc., 333 F.3d 906, 909-10 (8th Cir. 2003) – a case involving racially disparaging statements and threats made directly to the plaintiff, yet the Court of Appeals described the matter as "a close case." The Court does not condone McMillen's statements, and (for what it is worth) believes Defendant acted properly in disciplining her. Nonetheless, her offensive statements and the circumstances in which they were made were not sufficiently egregious to constitute actionable harassment.

The second obstacle to Plaintiff's claim is his inability to demonstrate Defendant knew or should have known of McMillen's improper statements prior to his complaint and failed to take proper action. E.g., Cheshewalla v. Rand & Son Construction Co., 415 F.3d 847, 850 (8th Cir. 2005). Plaintiff did not complain about McMillen's statements until shortly after he took full-time leave. Thereafter, (1) Plaintiff never encountered McMillen again and (2) McMillen was disciplined. Consequently, Plaintiff cannot maintain this claim.

## C. Gender Harassment

Plaintiff's claim of gender harassment suffers from the same infirmities as his claim of racial harassment. First, the gender-based statements Plaintiff attributes to McMillen are insufficiently severe or pervasive to support a claim of harassment. Second, Plaintiff never complained about these statements and there is no indication Defendant knew or had a reason to know McMillen made them.[6]

---

[6] Plaintiff intimates Defendant should have known he was raising a gender-based complaint because McMillen is female. Plaintiff's Affidavit ¶ 11. This fact hardly conveys the notion that Plaintiff believed he was subject to harassment based on his gender, nor does it convey the existence or content of McMillen's statements.

8

## III. CONCLUSION

For these reasons, Defendant's Motion for Summary Judgment is granted.

IT IS SO ORDERED.

                                                      /s/ Ortrie D. Smith
                                                      ORTRIE D. SMITH, JUDGE
DATE: January 13, 2006                  UNITED STATES DISTRICT COURT